# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### ELKINS

**SHEILA D. REEL,**

        **Plaintiff,**

  **v.**                          **Civil Action No.: 2:09-CV-99**
                                           **JUDGE MAXWELL**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.      INTRODUCTION

On August 14, 2009, Plaintiff Sheila D. Reel ("Plaintiff"), by counsel Joyce Helmick Morton, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant") pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). On October 22, 2009, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and administrative transcript of the proceedings. On November 17, 2009 and January 15, 2010, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment [15] [21]. Following review of the motions by the parties and the transcript of administrative proceedings, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A. Procedural Background

On March 18, 2005, Plaintiff applied for disability insurance benefits, alleging disability as of January 1, 2005. Tr. at 26 & 439-48; Pl. Doc. 17 at 1. On October 24, 2007, a United States Administrative Law Judge ("ALJ") held a hearing, and Plaintiff testified under oath. Tr. at 1439-1502. *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge). On January 25, 2008, the ALJ issued an unfavorable decision to Plaintiff, finding her not entitled to a period of disability. Tr. at 23-40.

On June 17, 2009 the Appeals Council denied Plaintiff's request for review on her disability application, which made the ALJ's decision the final decision of the Commissioner. Tr. at 12-14. *See* 20 C.F.R. § 404.967 (Appeals Council review--general); *see also* 20 C.F.R. § 404.981 (Effect of Appeals Council's decision or denial of review). Plaintiff now requests judicial review of the ALJ decision denying her application for disability.

### B. Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

> Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g). "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the

evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962). Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979). **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."** *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972). "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). In applying these legal standards, the Court reviews the decision by the ALJ.

### C. Standard for Disability and Five-Step Evaluation Process

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:      Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:      Determine whether the plaintiff has a severe impairment;

Step Three:      Determine whether the plaintiff has a "listed" impairment;

\* Residual Functional Capacity Assessment \*
(Needs to be Determined Before Proceeding to Step Four)

Step Four:      Compare residual functional capacity assessment to determine whether the plaintiff can perform past relevant work;

Step Five:      Consider residual functional capacity assessment, age, education, and work experience to determine if the plaintiff can perform any other work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general). In following the five-step process and coming to a decision, the ALJ makes findings of fact and conclusions of law. This Court will review the decision by the ALJ to determine whether it is supported by substantial evidence, in accordance with 42 U.S.C. § 405(g) and *Hays*.

### D.      Review of ALJ Application of Five-Step Evaluation Process and whether it is Supported by Substantial Evidence

#### 1.      Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....

If you are working or have worked as an employee...[g]enerally, in

> evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...
>
> [I]f you are self-employed [w]e will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity...
>
> If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled ***regardless of your medical condition*** or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a) (evaluation guide if you are an employee); *see also* 20 C.F.R. § 404.1575(a)(2) (evaluation guide if you are self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added). The ALJ found that Plaintiff has not engaged in substantial gainful activity at any time relevant to this decision. Tr. at 28.

### 2.      Step Two: Determine whether the Plaintiff has a Severe Impairment

> At the second step, we consider the medical severity of your impairment(s)...[A] severe impairment... [is] any impairment or combination of impairments which **significantly limits your physical or mental ability to do basic work activities**...We will not consider your age, education, and work experience...
>
> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. **Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs. Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.**

*See* 20 C.F.R. § 404.1520(c) (emphasis added); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989). The ALJ found Plaintiff to

have the following severe impairments: post laminectomy syndrome, cervical spine; degenerative disc disease of the lumbar spine; thoracic sprain; degenerative joint disease of the knees; status post cheilectomy and arthrodesis of the first metatarsal of the left foot; hallux rigidus; degenerative joint disease of the first metatasophalangeal joints bilaterally; bilateral carpal tunnel syndrome; fibromyalgia; and obesity. Tr. at 28-29.

### a. The ALJ Determined Not to Reopen Plaintiff's Prior Disability Applications

Prior to addressing Plaintiff's impairments, the ALJ found it unnecessary to reopen Plaintiff's prior disability applications. Tr. at 26. Plaintiff contends that she specifically requested to reopen all prior applications per her November 29, 2006 letter mailed to Social Security. Pl. Doc. 17 at 8 & Ex. 1. Plaintiff has two prior disability applications from 2001 and 2003. Tr. at 26. In January 2001, Plaintiff applied for disability, and an ALJ denied her application in April 2002. Tr. at 26. In November 2003, Plaintiff filed a second application for disability, and an ALJ denied the second application in May 2004. Tr. at 26. On March 18, 2005, Plaintiff filed her current application, alleging disability as of January 1, 2005. Tr. at 26 & 439-48; Pl. Doc. 17 at 1. In Plaintiff's November 2006 letter to Social Security, Plaintiff requested that "any prior files be reopened, *if applicable*..." Pl. Doc. 17 Ex. 1 (italics added). Plaintiff's alleged disability date in her pending application is January 1, 2005; and her prior disability applications were from 2001 and 2003; therefore, the ALJ found that Plaintiff's prior 2001 and 2003 disability applications were not applicable or relevant to the pending 2005 disability application. Tr. at 26.

As Plaintiff cites in her brief, the ALJ's decision to reopen prior applications is discretionary.

> A determination, revised determination, decision, or revised decision *may* be reopened – (a) Within 12 months of the date of the notice of the initial determination, for any reason; (b) Within four years of the date of the notice of the initial determination if we find good cause,

as defined in § 404.989, to reopen the case...

20 C.F.R. § 404.988 (italics added). Thus, reopening disability applications is not mandatory.

Moreover, Plaintiff does not allege a particular reason to mandate reopening the prior applications.

Accordingly, substantial evidence supports the ALJ's decision not to reopen Plaintiff's prior

disability applications.

### b. Plaintiff's Severe Impairment of Fibromyalgia and SSR 99-2p

Plaintiff states that the ALJ erred by not utilizing SSR 99-2p when considering Plaintiff's

severe impairment of fibromyalgia. Pl. Doc. 17 at 13-15.

> **Social Security Ruling Evaluating Cases Involving Chronic Fatigue Syndrome (CFS) SSR 99-2p**
>
> Purpose: To restate and clarify the policies of the Social Security Administration for developing and evaluating title II and title XVI claims for disability on the basis of Chronic Fatigue Syndrome (CFS), also frequently known as Chronic Fatigue and Immune Dysfunction Syndrome...
>
> Step 2. When an adjudicator finds that an individual with CFS has a medically determinable impairment, he or she must consider that the individual has an impairment that could reasonably be expected to produce the individual s symptoms associated with CFS, as required in 20 CFR 404.1529(b) and 416.929(b), and proceed to evaluate the intensity and persistence of the symptoms. Thus, if an adjudicator concludes that an individual has a medically determinable impairment, and the individual alleges fatigue, pain, symptoms of neurocognitive problems, or other symptoms consistent with CFS, these symptoms must be considered in deciding whether the individual's impairment is "severe" at step 2 of the sequential evaluation process and at any later steps reached in the sequential evaluation process. If fatigue, pain, neurocognitive symptoms, or other symptoms are found to cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basic work activities, the adjudicator must find that the individual has a "severe" impairment. See SSR 96-3p, "Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe..."

> **There is considerable overlap of symptoms between CFS and Fibromyalgia Syndrome (FMS), but individuals with CFS who have tender points have a medically determinable impairment.** Individuals with impairments that fulfill the American College of Rheumatology criteria for FMS (which includes a minimum number of tender points) may also fulfill the criteria for CFS. However, **individuals with CFS who do not have the specified number of tender points to establish FMS, will still be found to have a medically determinable impairment.**

*See* SSR 99-2p & n.3 (emphasis added). In February 2003, Anthony DiBartolomeo, M.D., diagnosed Plaintiff with fibromyalgia (FMS). Tr. at 1019-20. However, Plaintiff has never alleged and has never been diagnosed with Chronic Fatigue Syndrome (CFS). Plaintiff argues that the ALJ should have considered SSR 99-2p when determining whether Plaintiff had a severe impairment. Pl. Doc. 17 at 14. However, Plaintiff acknowledges that the ALJ already found Plaintiff to have the severe impairment of fibromyalgia. Pl. Doc. 17 at 14 & Tr. at 28-29. Notwithstanding, Plaintiff contends that the ALJ failed to consider SSR 99-2p in his analysis. Pl. Doc. 17 at 14. After a review of SSR 99-2p, the Court finds that the statute applies to individuals with Chronic Fatigue Syndrome (CFS) and not individuals who are solely diagnosed with fibromyalgia (FMS). Accordingly, the ALJ was not required to consider SSR 99-2p when evaluating Plaintiff's fibromyalgia.

### c.    The ALJ Reviewed the Record and Plaintiff's Testimony at the ALJ Hearing to Determine whether Plaintiff has a Significant Limitation on her Ability to Perform Basic Work Activities to Meet the Criteria for a Severe Mental Impairment

Plaintiff contends that the ALJ erred by finding that she does not have a severe mental impairment. Pl. Doc. 17 at 9. The ALJ reviewed the record and Plaintiff's testimony at the ALJ hearing to determine whether Plaintiff has a significant limitation on her ability to perform basic work activities to meet the criteria for a severe mental impairment. Tr. at 29-32 & 1439-1502.

In 1989 and 1994, Plaintiff received inpatient treatment at St. Joseph's Hospital for alcohol

abuse, with symptoms of depression. Tr. at 643 (background of mental treatment history); Tr. at 1236-50 (hospital records). She attended Alcoholics Anonymous for two years following the hospitalization in 1994. Tr. at 643.

From January 1991 through August 1999, Plaintiff worked as a retail parts manager, where she typed sale contracts, placed orders for parts, and unpacked the parts when they arrived. Tr. at 462, 466, 1451 & 1453.

From 1999 through 2003, Plaintiff worked as a secretary to a car dealership. Tr. at 440. In this position, she took care of the car rental fleet; accounts receivable; rented cars; answered the telephone; did filing; used machines, tools, or equipment; technical knowledge or skills; and wrote and completed reports. Tr. at 441 & 1450.

From September 2003 through December 2004, Plaintiff worked as a bookkeeper at a florist shop, and her duties included "a little bit of everything," answering the telephone, taking orders, and mopping the floor. Tr. at 462 & 1449. In her position as a bookkeeper, she used technical knowledge or skills and wrote reports or completed forms. Tr. at 464.

On January 13, 2004, Plaintiff had a psychological evaluation with psychologists Morgan D. Morgan, M.A., and Ronald D. Pearse, Ed.D. Tr. at 642-47. She told the examining psychologist that she was unsure why she had been sent for a psychological evaluation. Tr. at 645. Plaintiff said her daily activities consist of driving locally, cooking, washing the dishes, and some laundry. Tr. at 646. She said she watches television, listens to music, and sews with the aid of special lighting. Tr. at 646. The psychologists found her social functioning, concentration, persistence, and pace to all be within normal limits. Tr. at 646-47.

On January 27, 2004, Frank D. Roman, Ed.D., found no medically determinable mental

impairment. Tr. at 718.

From May 2004 through January 2005, Plaintiff worked as a cashier for a convenience store, which required using machines, tools, and equipment; and making sandwiches and hot dogs in the deli. Tr. at 463, 1448-49 & 1452.

On July 7, 2004, James Capage, Ph.D., concurred with the assessment by psychologist Roman that Plaintiff has no medically determinable mental impairment. Tr. at 718.

On March 18, 2005, Plaintiff applied for disability insurance benefits, alleging disability as of January 1, 2005 due to fibromyalgia, back and vision problems, and neuropathy in the feet. Tr. at 29 & 439-40. Plaintiff did not allege disability due to a mental impairment on her application for disability. Tr. at 29 & 439-40.

In May 2005, Plaintiff had a psychological evaluation with Morgan D. Morgan, M.A. Tr. at 765-70. Psychologist Morgan performed IQ testing on Plaintiff and reported a verbal IQ of 95; a performance IQ of 90; and a full scale IQ of 93. Tr. at 768. The psychologist determined that Plaintiff functions within the average range of intelligence. Tr. at 769. Plaintiff said her daily activities consist of cooking one meal and watching five hours of television. Tr. at 769. She does no household chores other than laundry once a week. Tr. at 769. The psychologist found her concentration to be within normal limits but found her social functioning, persistence, and pace to be mildly deficient. Tr. at 769. Psychologist Morgan diagnosed Plaintiff with major depressive disorder, recurrent, mild. Tr. at 769.

In June 2005, Plaintiff had a psychological evaluation by James W. Bartee, Ph.D. Tr. at 772-84. Dr. Bartee found that Plaintiff's mental impairment was not severe and that she had a mild limitation on her activities of daily living, social functioning, persistence, and pace. Tr. at 772 &782.

Her concentration was within normal limits. Tr. at 784. Plaintiff reported that she graduated high school and did not have any special education classes. Tr. at 784.

In August 2006, Plaintiff reported that her daily activities include doing some dishes, making the bed, watching television, and sitting on the front porch. Tr. at 492. She said she cooks small meals, prepares food in a crock pot, does some laundry, and drives on occasion. Tr. at 494-95. Plaintiff stated that she is able to pay bills, count change, handle a savings account, and use a checkbook. Tr. at 495.

In May 2007, Plaintiff had an examination with Beverly Epstein, M.D. Tr. at 967-69. Plaintiff reported that she watches her two-month old grandson. Tr. at 968.

On September 25, 2007, Plaintiff had a psychological evaluation by Jerry Spiegler, M.A., and Timothy Sarr, Ph.D. Tr. at 1155-60. The psychologists found that Plaintiff's chronic conditions satisfied the diagnostic criteria for somatization disorder, resulting from her hysterectomy, bilateral salpingo-oopherectomy, cervical discectomies, and decreased vision. Tr. at 1160.

On October 17, 2007, Plaintiff had an initial psychological assessment with United Summit Center. Tr. at 1276-79. Plaintiff reported that she was depressed as a teenager after discovering she was adopted. Tr. at 1277. Plaintiff stated that she has never received treatment for depression other than staying at the Morgantown hospital for a couple days. Tr. at 1277. She has never been in a mental hospital. Tr. at 1277. Plaintiff was oriented times four and she said she conducts her activities of daily living with minimal assistance. Tr. at 1286. Plaintiff reported that she is seeking treatment for depression upon the recommendation of her attorney. Tr. at 1291. The evaluating staff assessed Plaintiff with a global functioning (GAF) of 45. Tr. at 1280.

On October 24, 2007, at the ALJ Hearing, Plaintiff testified she had some depression. Tr. at

1456. Plaintiff acknowledged that she has never been treated for a mental problem prior to September 2007. Tr. at 1455-56 & 1461. Plaintiff stated that she has belonged to a woman's civic group making or sewing heart pillows for 20 years. Tr. at 1447-48 & 1466-67. She said she babysits her eight-month old grandchild one day per week for four hours. Tr. at 1465-66. Plaintiff testified that she has a valid driver's license and drives on occasion. Tr. at 1446-47.

On December 17, 2007, Charles Scharf, M.D., of the United Summit Center, completed a one and one-half page report diagnosing Plaintiff with major depression, severe, and chronic pain syndrome. He assessed her global functioning (GAF) as 40. Tr. at 1295-96.

In April 2008, the clinician at United Summit Center assessed Plaintiff as oriented times four; that she conducts her activities of daily living with minimal assistance; and that her global functioning (GAF) was 44. Tr. at 1311.

"An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. Substantial evidence supports the ALJ's conclusion that Plaintiff does not have a significant limitation on her ability to perform basic work activities to meet the criteria for a severe mental impairment.

### 3. Step Three: Determine whether the Plaintiff has a "Listed" Impairment

If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

Most of the listed impairments are permanent or expected to result in death. *See* 20 C.F.R. § 404.1525(a).

We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s). *See* 20 C.F.R. § 404.1513(a).

To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing. *See* 20 C.F.R. § 404.1513(a) (emphasis added).

***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***. *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

Plaintiff contends that the ALJ erred in finding that her multiple impairments do not "equal" a listing impairment. Pl. Doc. 17 at 9-15.

(a) Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment.

(b) We can find medical equivalence in three ways.

(**1**)(i) If you have an impairment that is described in appendix 1, but--

(A) You do not exhibit one or more of the findings specified in the particular listing, or

(B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii) **We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.**

(**2**) If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments. **If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment**, we will find that your impairment(s) is medically equivalent to the analogous listing.

(**3**) If you have a combination of impairments, no one of which meets a listing (see § 404.1525(c)(3)), we will compare your findings with those for closely analogous listed impairments. **If the findings related to your impairments are at least of equal medical significance to those of a listed impairment**, we will find that your combination of impairments is medically equivalent to that listing.

*See* 20 C.F.R. § 404.1526 (emphasis added). Plaintiff also contends that the ALJ failed to consider

her impairments individually and in combination. Pl. Doc. 17 at 9. Following a review of the record, Plaintiff's medical history, Plaintiff's credibility, and consideration of the criteria for listings 12.04, 12.07, and 1.00; the ALJ found that Plaintiff does not meet or medically equal the criteria for a listing impairment. Tr. 28-39.

### a. Listing 12.04 Affective Disorders

"12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 Affective Disorders. Since the ALJ found that Plaintiff did not meet the criteria for a severe mental impairment, the ALJ necessarily also found that Plaintiff does not meet or equal the criteria for listing level depression under 12.04. For a review of the medical history and record of Plaintiff's alleged mental impairment, *see supra*, Section II.D.2, of this Report and Recommendation.

### b. Listing 12.07 Somatoform Disorders

**12.07 Somatoform Disorders:** Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. **The required level of severity for these disorders is met when the requirements in both A and B are satisfied.**

**A.** Medically documented by evidence of one of the following: 1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or 2. Persistent nonorganic disturbance of one of the following: a. Vision; or b. Speech; or c. Hearing; or d. Use of a limb; or e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or f. Sensation (e.g., diminished or heightened). 3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; **And**

**B.** Resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07 (Somatoform Disorders) (emphasis added). Plaintiff concedes that she does not meet the (B) criteria but contends that her history of vision loss satisfies the (A) criteria. Pl. Doc. 17 at 9-10. The ALJ reviewed Plaintiff's medical history and daily activities to determine whether her alleged vision loss meets the criteria for listing level somatoform disorder. Tr. at 29-33 & 38-39. In September 2005, Kevin Cox, M.D., evaluated Plaintiff and opined that she had no obvious ophthalmologic disease or injury. Tr. at 795. Dr. Cox further diagnosed Plaintiff as having hysteria versus malingering. Tr. at 796. Moreover, the ALJ noted that despite alleging severe visual loss, Plaintiff watches television (5 hours a day); watches her grandchild for 4 hours once a week; and previously sewed in the women's club. Tr. at 30-31 & 39. The ALJ also noted that Plaintiff has an active driver's license and drives on occasion and that she wears glasses but does not have a prescription. Tr. at 30 & 34. From this evidence, the ALJ found that Plaintiff's alleged vision loss does not satisfy the (A) criteria for listing 12.07 (somatoform disorder). Tr. at 30-32.

### c.      Listing 1.00 Musculoskeletal System

**1.00 Musculoskeletal System** Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes. Impairments may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events, or neoplastic, vascular, or toxic/metabolic diseases...

General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence...

Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. **The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months...**

**To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.** They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the **inability to walk without the use of** a walker, two crutches or **two canes**, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the **inability to carry out routine ambulatory activities, such as shopping and banking**, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation...

Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) or, for straight-leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. Observations of the individual during the examination should be reported; e.g., how he or she gets on and off the examination table. Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss...

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 (Musculoskeletal System) (emphasis added). Plaintiff

contends that her severe impairments of post laminectomy syndrome, cervical spine; degenerative

disc disease of the lumbar spine; thoracic sprain; degenerative joint disease of the knees; status post

cheilectomy and arthrodesis of the first metatarsal of the left foot; hallux rigidus; degenerative joint

disease of the first metatasophalangeal joints bilaterally; bilateral carpal tunnel syndrome; and fibromyalgia should equal a listing under 1.00 (Musculoskeletal System). Pl. Doc. 17 at 10. In addition, Plaintiff contends that the ALJ should have considered her history of heel spurs, back pain, reflex loss, sensory loss, trochanteric bursitis of both hips to find that she equals a listing under 1.00 (Musculoskeletal System). Pl. Doc. 17 at 10-12. After considering Plaintiff's medical history and impairments, the ALJ found that her multiple musculoskeletal impairments and fibromyalgia are not supported by clinical findings that satisfy the requirements in any of the listed impairments contained in Section 1.00. Tr. at 32.

### (1)    Review of Record from 1991 through 2005

From January 1991 through August 1999, Plaintiff worked as a retail parts manager, where she typed sale contracts, placed orders for parts, and unpacked the parts when they arrived. Tr. at 462, 466, 1451 & 1453. In this position, she spent one hour per day walking, two hours per day standing, and two hours per day sitting. Tr. at 466.

In 1993 and 1998, Plaintiff underwent cervical discectomy surgery. Tr. at 537, 556 & 653.

From 1999 through 2003, Plaintiff worked as a secretary to a car dealership. Tr. at 440. In this position, she took care of the car rental fleet; accounts receivable; rented cars; answered the telephone; did filing; used machines, tools, or equipment; technical knowledge or skills; and wrote and completed reports. Tr. at 441 & 1450. In this position, she spent two hours per day walking and six hours per day sitting. Tr. at 465.

In January 2001, Plaintiff applied for disability, and an ALJ denied her application in April 2002. Tr. at 26.

In November 2002, Plaintiff was tested for carpal tunnel and the results were abnormal,

which "is supportive of bilateral carpal tunnel syndrome. Changes were mild on the left side and slightly more prominent on the right side." Tr. at 763.

In December 2002, Plaintiff had an examination with James D. Weinstein, M.D. Tr. at 649. Dr. Weinstein reviewed an MRI for the cervical and lumbar areas and opined that there is nothing that requires further surgery. Tr. at 649. Dr. Weinstein further noted that the cervical films show good fusion at the site of her two discectomies. Tr. at 649.

In February 2003, Plaintiff had an evaluation with Dr. DiBartolomeo, and he found multiple tender points in her neck and periscapular areas, as well as mid back, low back, buttocks, and anterior and lateral thighs. Tr. at 1019-20. Dr. DiBartolomeo noted that she takes the narcotic pain medication, Lortab, six times daily and has been on OxyContin in the past. Tr. at 1019. Dr. DiBartolomeo opined that:

> I think the most likely explanation for her difficulties is fibromyalgia, which might be being aggravated by the narcotics. The rheumatology literature has good evidence that narcotics make the symptoms of fibromyalgia worse, in the long run. Therefore, I advised her to avoid narcotics if at all possible and started her on Paxil 20 mg daily. I have asked her to return for a follow up to see if this has done any good.

Tr. at 1019.

From September 2003 through December 2004, Plaintiff worked as a bookkeeper at a florist shop, and her duties included "a little bit of everything," answering the telephone, taking orders, and mopping the floor. Tr. at 462 & 1449. In her position as a bookkeeper, she used technical knowledge or skills and wrote reports or completed forms. Tr. at 464. In this position, she spent three hours per day walking, five hours per day standing, and three hours per day sitting. Tr. at 464.

In November 2003, Plaintiff filed a second application for disability, and an ALJ denied the second application in May 2004. Tr. at 26.

On January 13, 2004, Plaintiff had a psychological evaluation. Tr. at 642-47. Plaintiff said her daily activities consist of driving locally, cooking, washing the dishes, and some laundry. Tr. at 646. She said she watches television, listens to music, and sews with the aid of special lighting. Tr. at 646.

On January 14, 2004, Plaintiff had another examination with Dr. Weinstein. Tr. at 648. Dr. Weinstein reviewed an MRI and opined that it looked negative. Tr. at 648. Dr. Weinstein noted that on the MRI there was an "arrow pointing on one of the films to a lateral disc bulge. I don't think it is significant, and certainly I wouldn't recommend operating on that..." Tr. at 648.

On January 30, 2004, Plaintiff had a disability determination examination with Bennett D. Orvik, M.D. Tr. at 699-705. At the time of the examination, Plaintiff reported pain in her low back and feet. Tr. at 699. Plaintiff did not report any neck pain. Tr. at 699-705. Dr. Orvik noted no muscle atrophy and that Plaintiff does not use any assistive devices to walk. Tr. at 703-04.

From May 2004 through January 2005, Plaintiff worked as a cashier for a convenience store, which required standing on concrete floors for eight hours per day; using machines, tools, and equipment; and making sandwiches and hot dogs in the deli. Tr. at 463, 1448-49 & 1452.

On March 18, 2005, Plaintiff filed her current application for disability insurance benefits, alleging disability as of January 1, 2005 due to fibromyalgia, back and vision problems, and neuropathy in the feet. Tr. at 29 & 439-40.

In April 2005, Plaintiff completed a disability function report and personal pain questionnaire. Tr. at 469-81. Plaintiff reported that she has used narcotic pain medication since 1995. Tr. at 478. She stated that she uses a cane but that it was not prescribed by a doctor. Tr. at 475. Plaintiff said she obtained the cane through rehabilitation four years ago. Tr. at 475.

In May 2005, Plaintiff had a psychological evaluation. Tr. at 765-70. Plaintiff said her daily activities consist of cooking one meal and watching five hours of television. Tr. at 769. She does no household chores other than laundry once a week. Tr. at 769.

In June 2005, Plaintiff had an evaluation with Chad C. Smalley, M.D. for complaints of bilateral knee pain. Tr. at 1013-14. Dr. Smalley noted that prior x-rays show very mild evidence of osteoarthritic changes mostly at the patellofemoral joint bilaterally. Tr. at 1013. There was no evidence of acute abnormal bony pathology, fracture, or dislocation noted. Tr. at 1013. On examination, Plaintiff had tenderness of the knees but did not have much in the way of medial or lateral joint line tenderness. Tr. at 1013. Her knees have full range of motion without limitations, and she was stable to ligamentous testing. Tr. at 1013.

In July 2005, Plaintiff had another disability determination examination with Dr. Orvik. Tr. at 786-91. At the time of the examination, Plaintiff reported pain in her back, legs, and feet. Tr. at 786. Plaintiff again did not report any neck pain. Tr. at 786-91. Dr. Orvik noted that Plaintiff is not on any antidepressant medication, which may help with the fibromyalgia. Tr. at 790. Plaintiff's gait was reasonably normal and she does not use any assistive devices to walk. Tr. at 789.

In September 2005, Plaintiff had an examination with a podiatrist for complaints of severe pain in the left foot and mild pain in the right foot. Tr. at 1009. The podiatrist diagnosed Plaintiff with hallux rigidus, degenerative joint disease, first metatarsophalangeal joint bilaterally, and difficulty with ambulation. Tr. at 1010.

In November 2005, the podiatrist performed cheilectomy surgery on Plaintiff's left first metatarsophalangeal joint. Tr. at 1005.

On December 21, 2005, Plaintiff had a an examination with Colleen Watkins, M.D. Tr. at

999-1000. Plaintiff reported that her left foot was markedly improved. Tr. at 999. Plaintiff complained of bilateral knee pain but examination revealed minimal crepitus of the knees. Tr. at 999.

On December 30, 2005, Plaintiff had a follow-up examination with the podiatrist. Tr. at 998. She complained of increased left foot pain due to increased walking following her husband's heart attack. Tr. at 998.

### (2)      Review of Record from 2006 through 2007

In March 2006, Plaintiff reported that she did not have any left foot problems. Tr. at 994. The podiatrist found that Plaintiff could continue to weight bear and walk in a regular shoe. Tr. at 994.

In April 2006, Plaintiff had an orthopedic examination with Joseph Hahn, M.D. Tr. at 992-93. She indicated that the Depo-Medrol steroid injections in her knees provide her with relief and that her knees have been doing reasonably well until two weeks ago. Tr. at 992. At that time, Plaintiff had a long haul ride with her husband, who is a truck driver, and she developed some sciatic type complaints. Tr. at 992. Upon examination, Plaintiff's knees had significant patellofemoral crepitus bilaterally, but there was no evidence of effusion or weakness in the lower extremities. Tr. at 992. Dr. Hahn found that Plaintiff is a candidate for repeat Depo-Medrol steroid injections in her knees. Tr. at 992.

In August 2006, Plaintiff reported that her daily activities include doing some dishes, making the bed, watching television, and sitting on the front porch. Tr. at 492. She said she cooks small meals, prepares food in a crock pot, does some laundry, and drives on occasion. Tr. at 494-95. Plaintiff stated that she is able to pay bills, count change, handle a savings account, and use a checkbook. Tr. at 495.

In October 2006, Plaintiff had an evaluation with the podiatrist for complaints of pain in both feet. Tr. at 985. Plaintiff reported that following her surgery in November 2005, her pain had decreased, but that now the pain has returned and she cannot walk or do the things she would like to do. Tr. at 985. Plaintiff elected to have surgery, and the podiatrist advised her that following the surgery, Plaintiff would be unable to squat or wear high heels. Tr. at 985.

In December 2006, Plaintiff had surgery on her first metatarsal arthrodesis of the first metatarsal of the left foot. Tr. at 864-65 & 979.

In February 2007, Plaintiff had a follow-up examination with the podiatrist, and she reported no problems with her foot. Tr. at 976. The podiatrist found that she could weight bear in a regular shoe. Tr. at 976.

In March 2007, Plaintiff had an orthopaedic follow-up examination and x-rays of her lumbar spine. Tr. at 971-75. The x-rays showed mild degenerative changes in the lower lumbar spine. Tr. at 975. Upon examination, Plaintiff's knees had minimal effusion, full range of motion, and no erythema or warmth. Tr. at 971. A musculoskeletal examination revealed no synovitis of the small joints of her hands, wrists, elbows, knees, or ankles. Tr. at 973. She had a negative straight-leg raise test. Tr. at 973.

In May 2007, Plaintiff had an examination with Beverly Epstein, M.D. Tr. at 967-69. At the time of the examination, Plaintiff reported back pain radiating down the right thigh to the knee since 1993 and neck tightness after surgery in 1993 and [1998]. *See* Tr. at 967. The range of motion in her neck was within functional limits with complaints of central cervical stiffness with all motion. Tr. at 968. Plaintiff had a positive straight-leg test at 70 degrees. Tr. at 968. Plaintiff said that she watches her two-month old grandson. Tr. at 968. Plaintiff said she uses a cane but did not bring it

with her to the examination. Tr. at 967. Plaintiff further stated that she walks about a mile a day. Tr. at 967. Dr. Epstein diagnosed Plaintiff with, *inter alia*, right sacroiliac dysfunction; right greater trochanteric bursitis; mild herniated disk without myelopathy L4-L5 not causing any nerve root compression; and degenerative disk disease of lumbosacral spine. Tr. at 968. Dr. Epstein prescribed conservative treatment for Plaintiff, including physical therapy and pain injections. Tr. at 969.

In July 2007, Cynthia M. Osborne, D.O., a state agency medical consultant, performed a physical residual capacity assessment on Plaintiff and found that she could perform light work with limitations. Tr. at 1124-31.

> *Light work* involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work...

> *Sedentary work* involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met...If someone can do light work, we determine that he or she can also do sedentary work.

*See* 20 C.F.R. § 404.1567 (italics added). In concluding that Plaintiff could perform light work, Dr. Osborne noted that Plaintiff has a history of joint pain due to osteoarthritis. Tr. at 1125. Dr. Osborne noted that Plaintiff does not have any muscle weakness. Tr. at 1125.

On October 5, 2007, Plaintiff had another examination with Dr. Epstein. Tr. at 1209-10. Plaintiff said she uses a cane but did not bring it with her to the examination. Tr. at 1210. Dr. Epstein

opined that she sees "no reason why she cannot work at a job where she can stand and sit at will."

Tr. at 1210.

On October 24, 2007, at the ALJ Hearing, Plaintiff testified that she has belonged to a woman's civic group making or sewing heart pillows for 20 years. Tr. at 1447-48 & 1466-67. She said she babysits her eight-month old grandchild one day per week for four hours. Tr. at 1465-66. Plaintiff testified that she has a valid driver's license and drives on occasion. Tr. at 1446-47. Plaintiff brought her cane to the hearing and testified that her orthopaedic doctor prescribed the cane. Tr. at 1478. Plaintiff said that she has carried the cane for about a year. Tr. at 1478.

### (3)        ALJ Conclusion regarding Listing 1.00 Musculoskeletal System

The ALJ found that Plaintiff has failed to establish that her combined impairments are of a level of severity to satisfy the requirements of any of the impairments detailed in Appendix 1. Tr. at 33.

> **1.00 Musculoskeletal System** Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes. Impairments may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events, or neoplastic, vascular, or toxic/metabolic diseases...
>
> General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other **neurological deficits**; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence...
>
> Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. **The inability to ambulate**

**effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months...**

**To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.** They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the **inability to walk without the use of** a walker, two crutches or **two canes**, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the **inability to carry out routine ambulatory activities, such as shopping and banking**, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation...

Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) or, for straight-leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. Observations of the individual during the examination should be reported; e.g., how he or she gets on and off the examination table. Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss...

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 (Musculoskeletal System) (emphasis added). After considering the evidence in the record, the ALJ found that Plaintiff's medically determinable impairments could reasonably produce her alleged symptoms, but Plaintiff's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible. Tr. at 34.

The ALJ further found that Plaintiff failed to establish that her impairments resulted in an inability to ambulate effectively, as defined in 1.00. Tr. at 33. In January 2004, Plaintiff had a disability determination examination with Dr. Orvik. Tr. at 699-705. Dr. Orvik noted no muscle

atrophy and that Plaintiff does not use any assistive devices to walk. Tr. at 703-04. In April 2005, Plaintiff completed a disability function report and reported that she uses a cane but that it was not prescribed by a doctor. Tr. at 475. Plaintiff said she obtained the cane through rehabilitation four years ago. Tr. at 475. In July 2005, Plaintiff had another disability determination examination with Dr. Orvik, who found that Plaintiff's gait was reasonably normal and that she does not use any assistive devices to walk. Tr. at 789. In December 2005, Plaintiff had a follow-up examination with the podiatrist. Tr. at 998. She complained of increased left foot pain due to increased walking following her husband's heart attack. Tr. at 998. In May 2007, Plaintiff had an examination with Dr. Epstein. Tr. at 967-69. Plaintiff said she uses a cane but did not bring it with her to the examination. Tr. at 967. Plaintiff further stated that she walks about a mile a day. Tr. at 967. On October 5, 2007, Plaintiff had another examination with Dr. Epstein. Tr. at 1209-10. Plaintiff again said she uses a cane but again did not bring it with her to the examination. Tr. at 1210. On October 24, 2007, at the ALJ Hearing, Plaintiff brought her cane to the hearing and testified that her orthopaedic doctor prescribed the cane. Tr. at 1478. Plaintiff said that she has carried the cane for about a year. Tr. at 1478. From this evidence, the ALJ found that Plaintiff has failed to establish that she was in a non-weight bearing status for any continuous 12-month period, as defined Listing 1.00. Tr. at 33.

The ALJ found that regarding Plaintiff's back and lower extremity impairments, she received conservative treatment for these conditions for the period in question, with the exception of her left foot surgery. Tr. at 38. The ALJ found Plaintiff's back and next condition are not accompanied by any significant neurological deficit, as listed in 1.00. *See* Tr. at 32. Despite being diagnosed with carpal tunnel, the ALJ noted that this condition has not required surgery. Tr. at 33.

The ALJ found that limiting Plaintiff to performing light work with no climbing of ladders,

ropes, or scaffolds adequately accommodates Plaintiff's limitations from her post laminectomy syndrome of the cervical spine; her bilateral carpal tunnel syndrome; her back and lower extremity impairments; and her fibromyalgia. Tr. at 35 & 38. The ALJ concluded that the finding that Plaintiff can perform light work with limitations is consistent with the July 2007 physical residual capacity assessment by Dr. Osborne, the state agency medical consultant. Tr. at 39.

### d. Listing 1.04 Disorders of the Spine

Plaintiff contends that the ALJ failed to evaluate her impairments under listing 1.04. Pl. Doc. 17 at 11.

> **1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> **A.** Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> **B.** Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> **C.** Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (Disorders of the spine) (emphasis added). The ALJ reviewed Plaintiff's medical history to determine whether she met the criteria for any listed musculoskeletal impairment under Section 1.00, which includes 1.04. Tr. at 28-39.

In December 2002, Plaintiff had an examination with James D. Weinstein, M.D. Tr. at 649. Dr. Weinstein reviewed an MRI for the cervical and lumbar areas and opined that there is nothing that requires further surgery. Tr. at 649. Dr. Weinstein further noted that the cervical films show good fusion at the site of her two discectomies. Tr. at 649. In January 2004, Plaintiff had another examination with Dr. Weinstein. Tr. at 648. Dr. Weinstein reviewed an MRI and opined that it looked negative. Tr. at 648. Dr. Weinstein noted that on the MRI there was an "arrow pointing on one of the films to a lateral disc bulge. I don't think it is significant, and certainly I wouldn't recommend operating on that..." Tr. at 648. In March 2007, Plaintiff had an orthopaedic follow-up examination and x-rays of her lumbar spine. Tr. at 971-75. The x-rays showed mild degenerative changes in the lower lumbar spine. Tr. at 975. Upon examination, Plaintiff's knees had minimal effusion, full range of motion, and no erythema or warmth. Tr. at 971. A musculoskeletal examination revealed no synovitis of the small joints of her hands, wrists, elbows, knees, or ankles. Tr. at 973. She had a negative straight-leg raise test. Tr. at 973. In May 2007, Plaintiff had an examination with Dr. Epstein. Tr. at 967-69. At the time of the examination, Plaintiff reported back pain radiating down the right thigh to the knee since 1993 and neck tightness after surgery in 1993 and [1998]. *See* Tr. at 967. The range of motion in her neck was within functional limits with patient complaining of central cervical stiffness with all motion. Tr. at 968. Plaintiff had a positive straight-leg test at 70 degrees. Tr. at 968. Dr. Epstein diagnosed Plaintiff with, *inter alia*, right sacroiliac dysfunction; right greater trochanteric bursitis; mild herniated disk without myelopathy L4-L5 not causing any nerve root compression; and degenerative disk disease of lumbosacral spine. Tr. at 968. Dr. Epstein prescribed conservative treatment for Plaintiff, including physical therapy and pain injections. Tr. at 969.

After reviewing the evidence in the record, the ALJ found that Plaintiff did not meet the criteria for any of the impairments detailed in Section 1.00, which includes Section 1.04 (Disorders of the spine). *See* Tr. at 32.

### e. ALJ Conclusion regarding Step Three Listing Impairments

Following a review of the record, Plaintiff's medical history, Plaintiff's credibility, and consideration of the criteria for listings 12.04, 12.07, and 1.00; the ALJ considered Plaintiff's impairments individually and in combination and found that Plaintiff does not meet or medically equal the criteria for a listing impairment. Tr. 28-39. Substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically equal the criteria for a listed impairment.

### * Residual Functional Capacity Assessment *
### (Needs to be Determined Before Proceeding to Step Four)

> If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

> Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

> Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

> Social Security Regulation (SSR) 96-8p. Residual functional capacity
> is to be determined by the ALJ only after he considers all relevant
> evidence of a claimant's impairments and any related symptoms (*e.g.*,
> pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d

559 (4th Cir. 2006). The ALJ reviewed Plaintiff's medical evidence, impairments, limitations, pain

symptoms, daily activities, and credibility; and from the entire record, the ALJ concluded that

Plaintiff has the residual functional capacity to perform light work. Tr. at 34. Specifically, the ALJ

found that Plaintiff has the residual functional capacity to perform light work with modifications.

She can perform all postural movements on an occasional basis, except she cannot climb ladders,

ropes, or scaffolds. She must avoid concentrated exposure to extreme cold, vibration, and hazards,

such as moving plant machinery and unprotected heights. Tr. at 34.

The medical history and review of the record under steps two and three of this Report and

Recommendation, for severe and listing impairments, outlines the basis for substantial evidence to

support the ALJ's residual functional capacity assessment that Plaintiff could perform light work.

### 4. Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work

> At the fourth step, we consider our assessment of your residual
> functional capacity and your past relevant work.
> 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15
> years, that was substantial gainful activity, and that lasted long
> enough for you to learn to do it.
> 20 C.F.R. § 404.1560(b).
>
> Your impairment(s) must prevent you from doing your past relevant
> work.  If we cannot make a determination or decision at the first three
> steps of the sequential evaluation process, we will compare our
> residual functional capacity assessment...with the physical and mental
> demands of your past relevant work. (See § 404.1560(b).) If you can

still do this kind of work, we will find that you are not disabled.
*See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is able to perform her past relevant work as a parts clerk (light / semi-skilled); rental clerk (sedentary as performed by Plaintiff and light as performed in the national economy / skilled); and office clerk (sedentary / unskilled). Tr. at 39. This is consistent with Plaintiff's residual functional capacity and the testimony of the vocational expert. Tr. at 39. Plaintiff contends that the ALJ did not follow the steps of SSR 82-62 when evaluating whether Plaintiff can return to her past relevant work. Pl. Doc. 17 at 17-18. However, the ALJ did consider Plaintiff's residual functional capacity and her physical and mental limitations in determining whether she could return to her past relevant work, in accordance with SSR 82-62. Plaintiff also contends that the ALJ did not take her obesity into account, since is 5 feet, 6 inches tall and weighs 199 pounds. Pl. Doc. 17 at 16-17 & n.7. However, the ALJ found that Plaintiff's obesity was a severe impairment, and he made lengthy findings as to any effect from her obesity, in accordance with SSR 02-1p. Tr. at 28-29 & 33.

The medical history and review of the record under steps two and three of this Report and Recommendation, for severe and listing impairments, outlines the basis for substantial evidence to support the ALJ's conclusion that Plaintiff could perform her past relevant work.

**5.     Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work**

At the fifth and last step...

[i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational

> factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c). At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff, in the alternative, could perform any other work. Tr. at 39-40. Plaintiff contends that the ALJ did not properly consider her age. Pl. Doc. 17 at 15-16. However, the ALJ noted that Plaintiff attained the age of 50 years old, which makes her an individual "closely approaching advanced age" as defined in the Social Security Act. Tr. at 39. *See* 20 C.F.R. § 404.1563 (age as a vocational factor). The ALJ found that Plaintiff has a high school education and transferability of job skills is not an issue. Tr. at 39-40. *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills).

Vocational Expert Larry Bell testified that someone with Plaintiff's residual functional capacity, age, and education would be able to perform "light exertional" jobs such as office assistant and office cleaner and "sedentary" jobs such as machine tender and general sorter. Tr. at 1492. Mr. Bell stated that there were at least 11,850 of these types of jobs available regionally in West Virginia, eastern Ohio, western Maryland, and western Pennsylvania; and there were 741,000 jobs available nationwide. Tr. at 1492.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that Plaintiff could perform. Tr. at 40. Substantial evidence supports the ALJ's decision that Plaintiff could perform light work.

Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529. **Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599. "This Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock*, 483 F.2d at 775. **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added). Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff could perform light work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's application filed on March 18, 2005, the Plaintiff was not entitled to disability insurance benefits. Tr. at 40. The Court finds that substantial evidence supports the ALJ's decision that Plaintiff was not disabled and could perform work in the national economy.

## III.    RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[21]**, **DENY** Plaintiff's Motion for Summary Judgment **[15]**, and **AFFIRM** the Decision of the Administrative Law Judge. The Court notes the Plaintiff's objections to the ruling.

Within fourteen (14) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this

Recommendation. The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to the District Judge. Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation. 28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: March 2, 2010**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE